In re the **CLARK ENTERTAINMENT GROUP, INC.,** Debtor.

**SONY MUSIC ENTERTAINMENT, INC.,** Plaintiff,

v.

The **CLARK ENTERTAINMENT GROUP, INC.,** Defendant.

**Bankruptcy No. 92–37209.**
**Adv. No. 93–3046TG.**

United States Bankruptcy Court, D. New Jersey.

June 8, 1995.

Thomas M. Kittredge, Morgan, Lewis & Bockius, Philadelphia, PA, for plaintiff.

Frank J. Cozzarelli, Salerno, Cozzarelli, Mautone, Desalvo & Nussbaum, P.C., Verona, NJ, for defendant.

*OPINION*

WILLIAM H. GINDIN, Chief Judge.

### INTRODUCTION

This adversary proceeding involves the possession by debtor/defendant, the Clark Entertainment Group, Inc. ("Clark"), of certain audio tapes which were created by Columbia Records ("Columbia"), predecessor to Sony Music Entertainment Inc., plaintiff herein ("Sony"), and embody performances of Sony contracted artists. Plaintiff asserts common law causes of action against defendant, including conversion, unfair competition and copyright. Further, plaintiff seeks immediate possession of the tapes, or in the alternative, a permanent injunction barring debtor from copying and distributing the tapes.

This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (M) and (O).

### FACTS

The tapes in question were recorded at Columbia Studios in Nashville, Tennessee some time prior to 1972; they contain rehearsal performances of recognized recording artists, including The Byrds, Johnny Cash, David Houston, Jim & Jessie, Bob Luman, Marty Robbins, The Statler Brothers, Bobby Vinton, and Charlie Walker among others. Some of the performances are of songs contained in previously released albums while the remainder are performances of songs that were never publicly released. The chronicle of the chain of possession of these tapes is as follows:

Michael Figlio, an employee of Columbia, was the first to acquire the tapes. According to the testimony at trial, Figlio was granted permission to retain these tapes by Columbia through two different company policies. Initially, Figlio was permitted to take used tapes which otherwise would have been discarded. Later, when Columbia changed this policy and began to sell used tapes to employees and the public, Figlio purchased additional tapes. Without listening to them,

Figlio placed all of the tapes he had procured in a Nashville warehouse storage facility.

Columbia Records was purchased by Sony in 1988. Sony thereby succeeded to all of the rights of Columbia. Sometime in the late 1980's, Figlio became delinquent in making his storage rental payments and the storage facility auctioned the contents of his locker on June 27, 1990. Doug and Brenda Cole were the successful bidders at the public auction with a fifty dollar ($50.00) bid. The aforementioned tapes were discovered among other items located in the locker. The Coles subsequently sold the tapes to debtor.

After acquiring possession of the tapes, the debtor, through its principal, Clark Enslin, contacted the plaintiff in order to determine if Sony had any interest in purchasing the tapes. Enslin contacted Sony a number of times. Sony did not agree to purchase the tapes and in fact filed lawsuits seeking possession of the tapes, based upon a claim of conversion, and seeking a restraining order prohibiting Enslin and/or debtor from selling, transferring or duplicating the tapes. Not knowing in which jurisdiction the tapes were located, Sony initiated parallel proceedings in both Tennessee and New Jersey state courts. On July 29, 1992, the Tennessee court entered an order granting a temporary injunction and on November 6, 1992, the same court orally issued an enforcement order against Enslin and debtor and sanctioned both for violating the injunction. On November 12, prior to the entry of a written order embodying the oral order of November 6, the debtor filed its petition under Chapter 11 of the Bankruptcy Code. The state court actions, consequently, were and remain stayed.

On January 27, 1993, Sony instituted the within adversary proceeding. An initial trial of this matter was held on April 13, 1993. At the conclusion of plaintiff's case, this court found that Sony had failed to meet its burden of proof with respect to conversion. Specifically, the court held that Sony had not demonstrated that the tapes were improperly taken by Figlio from Columbia. That ruling was appealed to the district court. On July 28, 1993, the District Court entered a Memorandum Opinion and Order ("Thompson Opinion") granting Sony's appeal and vacat-

ing the order of dismissal. The case was then remanded to the bankruptcy court for further proceedings consistent with the opinion. A second trial was held by the bankruptcy court on September 29, 1994 at which the parties agreed to stipulate that the record from the first trial would be incorporated as part of the record for the second trial. In addition, the bankruptcy court allowed the parties to supplement the trial testimony with depositions of certain parties. The present opinion constitutes the court's ruling after the second trial.

## DISCUSSION

### Conversion

■ As this case has been remanded by the district court, this court is bound by the district court's findings in its appellate capacity. *In re Huderson*, 96 B.R. 541, 548 (Bankr.E.D.Pa.1989); *see also Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833–34 (9th Cir.1982) and *Cherokee Nation v. Oklahoma*, 461 F.2d 674, 677–78 (10th Cir.1972), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972) (decision and contents of the Order and the Opinion of an appellate court are the "law of the case" upon remand to the lower court).

■ The district court instructed that in order to prevail on a claim for conversion, two elements must be proved: (1) that the plaintiff owned, or had a right to use, the property in question at the time of the conversion; and (2) the defendant's actions constituted an exercise of unlawful dominion over the plaintiff's property by the defendant in a manner that is inconsistent with the plaintiff's title or rights. *Royal Store Fixture Co. v. N.J. Butter Co.*, 114 N.J.Super. 263, 268–69, 276 A.2d 153 (N.J.Super.Ct.App.Div.1971); Thompson Opinion at 5. Judge Thompson held that the burden of proof is on the plaintiff to show that he has title or ownership of the property and that once plaintiff meets this burden, the burden shifts to the defendant to show that he came into possession of the property under such circumstances as to relieve him from liability for conversion. Thompson Opinion at 5 (citing *First Nat'l Bank of Blairstown v.*

*Goldberg,* 340 Pa. 337, 338, 17 A.2d 377 (Pa. 1941)).

The district court found that Sony's burden had been met. Judge Thompson held that Figlio's uncontroverted testimony at the first trial, i.e., that he obtained the tapes from Columbia and that Columbia was Sony's predecessor, established that Sony (as Columbia's successor) was the owner of the tapes prior to Figlio's possession. The district court then remanded the case for the bankruptcy court to determine whether defendant (as successor to Figlio) had rightfully come into possession of the tapes so as to relieve him from liability for conversion.

▮▮▮ It is first necessary to determine whether this matter is governed by the law of New Jersey or the law of Tennessee. While this is a core bankruptcy matter, Sony's claim arises under and is governed by state law. *In re Meyertech Corp.,* 831 F.2d 410, 416–18 (3rd Cir.1987). In an action where state law governs, federal courts look to the law of the forum state to resolve choice of law issues. *Fassett v. Delta Kappa Epsilon (New York),* 807 F.2d 1150, 1157 (3rd Cir.1986), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2463, 95 L.Ed.2d 872 (1987). The Third circuit has recently noted that

> New Jersey applies a governmental interest test to resolve choice of law issues. We have held the governmental interest test involves a two-part analysis. 'The court determines first the governmental policies evidenced by the laws of the related jurisdiction and second *the factual contact between the parties and each related jurisdiction.*' This approach is primarily concerned with the 'qualitative nature of the contacts ...'

*McFarland v. Miller,* 14 F.3d 912, 917 (3d Cir.1994) (citations omitted) (emphasis added). "As to the first prong of the governmental test, there are two recognized public policies in New Jersey: 1) the compensation interest of New Jersey domiciliaries and 2) the deterrence of future tortious conduct." *Washington v. Systems Maintenance,* 260 N.J.Super. 505, 510, 616 A.2d 1352 (N.J.Super.Ct.Law Div.1992) (citing *Pine v. Eli Lilly Co.,* 201 N.J.Super. 186, 193, 492 A.2d 1079 (N.J.Super.Ct.App.Div.1985)). Concerning

the "qualitative factual contacts," the New Jersey Supreme Court, in *Rose v. Port of New York Auth.,* 61 N.J. 129, 139–40, 293 A.2d 371 (N.J.1972), held that choice of law is governed by "the law of the jurisdiction having the most significant relationship and closest contacts with the occurrence and the parties." *Id.* at 140, 293 A.2d 371. Specifically, "[i]n tort cases, the traditional choice of law is the law of the place where the wrong occurred." *O'Connor v. Busch Gardens,* 255 N.J.Super. 545, 548, 605 A.2d 773 (N.J.Super.Ct.App.Div.1992).

With respect to the factual contacts test, Tennessee is the jurisdiction "having the most significant relationship and closest contacts with the occurrence." *Rose,* 61 N.J. at 140, 293 A.2d 371. The conversion allegedly occurred in Tennessee and both plaintiff and debtor's predecessor's were based in Tennessee at that time. As to the first prong, while New Jersey may have an interest in protecting the property of debtor, a New Jersey domiciliary, there is no nexus between the application of New Jersey law and the deterrence of conversion of property created and acquired in Tennessee. Accordingly, this court must employ Tennessee law to the liability aspects of the conversion action.

The threshold determination that must be made by this court, with respect to the conversion claim, is whether Figlio obtained rightful possession of the tapes. *AHCI, Inc. v. Short,* 878 S.W.2d 112, 114 (Tenn.App. 1993); *See Also Royal Store Fixture Co.,* 114 N.J.Super. at 268–69, 276 A.2d 153 (setting forth the same standard as Tennessee law). If there was a valid agreement transferring title, Figlio was the rightful owner prior to the auction sale of the tapes. *AHCI,* 878 S.W.2d at 114. In the instant case, there were enforceable oral agreements for Figlio to take the erased tapes. Each party provided the necessary consideration. Clearly, when Figlio paid for the tapes there was a valid exchange. Additionally, initially, during the period when Figlio was simply taking apparently blank tapes, there was an enforceable transfer. Each time Figlio took some tapes, Columbia provided the tapes and Figlio provided the service of disposing of the tapes. This agreement is enforceable

even though Figlio's consideration was non-monetary. Tenn.Code Ann. § 47–2–304.

Sony argues, however, that the mutual mistake of fact makes these transactions invalid. Judge Thompson suggests that a mistake of fact is not a defense to a claim for conversion. Thompson Opinion at 11 (citing *Morissette v. United States,* 342 U.S. 246, 270, 72 S.Ct. 240, 253, 96 L.Ed. 288 (1952)) (noting that "at common law, there are unwitting acts which constitute conversions"). Upon remand, it was made clear that there was a mistake of fact. Both Figlio and Columbia thought that the tapes given to Figlio were erased, when in fact some were not.

■ The general rule is that a contract is voidable when there is a mistake on the part of both parties as to a basic assumption on which the contract is made. *Reliance Fin. Corp. v. Miller,* 557 F.2d 674 (9th Cir. 1977); Restatement (Second) of Contracts § 152(1) (1981). Consequently, if plaintiff makes a demand for the return of goods transferred under a mistake, defendant may be liable for conversion. 89 C.J.S. *Trover and Conversion* § 10 (1955) (General rule is that mistake is not a defense to conversion). However, this general rule does not apply when the court determines that plaintiff bears the risk of the mistake. *See* Restatement (Second) of Contracts § 154 (1981); 89 C.J.S. *Trover and Conversion* § 10 (General rule does not apply where the mistake is mutual and where the owner's error is solely responsible for the mistake). "For example, it is commonly understood that the seller of farm land generally cannot avoid the contract of sale upon later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming." Restatement (Second) of Contracts § 154 cmt. a.

■ There was a mutual mistake of fact in that both Figlio and Columbia assumed that the tapes taken by Figlio had been erased. The court must next determine whether one of the parties should bear the risk that the tapes would not be erased. That decision is an equitable one. The bankruptcy court is one of equity and equitable principles must guide the bankruptcy judge. *United States*

*v. Energy Resources,* 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990). Additionally, the causes of action brought by plaintiff, that of injunction and replevin, are equitable actions. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 44, 109 S.Ct. 2782, 2791, 106 L.Ed.2d 26 (1989); *Bedford County Hospital v. County of Bedford,* 42 Tenn.App. 569, 304 S.W.2d 697, 701–2 (1957). Under the facts of this case it is equitable for Sony (as Columbia's successor) to bear the risk that the tapes would not be erased. Restatement (Second) of Contracts § 154. Columbia was responsible for erasing the tapes prior to disposal and the company should have known that if it did not erase the tapes properly, Figlio would be receiving tapes with potentially valuable material on them. Consequently, this court finds that there was a valid oral agreement between Columbia and Figlio and therefore Figlio took rightful possession of the tapes.

■ The last issue with respect to the conversion claims is whether the debtor acquired Figlio's rights and thus has a valid defense to Sony's conversion claim. A good faith subsequent purchaser of goods acquires the title which the transferor had or had power to transfer. *See* Tenn.Code Ann. § 47–2–403. Plaintiff does not contest the validity of the auction sale to the Coles nor the subsequent transfer to debtor. Based on the facts presented, this court finds that the warehouse sale and the transfer to Clark Entertainment were valid transfers conveying good title to debtor pursuant to § 47–2–403. *See also* Tenn.Code Ann. § 47–7–210(5) (purchaser in good faith of goods sold to enforce a warehouse lien takes the goods free of any rights of persons against whom the lien was valid). Debtor is the rightful owner of the tapes. It does not follow, however, that debtor may exploit the musical works contained on the tapes. Whether debtor is precluded from doing so by copyright law is discussed below.

## Copyright

■ Plaintiff's second claim is that exploitation and/or reproduction of the tapes for commercial purposes violates Sony's

rights under state copyright law. The parties agree that the tapes contain sound recordings fixed [1] prior to February 15, 1972. Sound recordings fixed prior to February 15, 1972 are not eligible for statutory copyright protection under the present Copyright Act, 17 U.S.C. § 301(c), nor were they protected under the Copyright Act of 1909. *See* 1 M. Nimmer, The Law of Copyright § 1.01[B], at 1–44 and § 4.06[B] at 4–35 (1993). Such sound recordings remain the subject of common law copyright and state law protection. 1 Nimmer § 1.01[B], at 1–44.

■ While the conversion claim is governed by Tennessee law, "conflict of laws principles do not require that all legal issues presented by a single case be decided under the law of a single state . . . and thus the law of different states can apply to different issues in the same case." *O'Connor*, 255 N.J.Super. at 547, 605 A.2d 773. Under the governmental interest test, the applicable law with regard to common law copyright protection should be New Jersey law. Application of New Jersey law will foster the New Jersey public policy of protection of property belonging to domiciliaries. *Washington*, 260 N.J.Super at 510, 616 A.2d 1352 (citing *Pine*, 201 N.J.Super. at 192, 492 A.2d 1079). With respect to the second prong, relationship with the occurrence and contacts with the parties, *Rose*, 61 N.J. at 140, 293 A.2d 371, New Jersey is the better forum. While the performances were created in Tennessee, the owner of the tapes, the debtor, is located in New Jersey and any infringement of a common law copyright presumably would occur in New Jersey. *O'Connor*, 255 N.J.Super. at 548, 605 A.2d 773 (holding that in tort cases, the traditional choice is the law of the place where the wrong occurred). This court, therefore, must apply New Jersey law to the issue of common law copyright protection of the performances embodied in the tapes.

■ With regard to the merits of the protection of the performances, Clark claims that because it has possession of the tapes, it has the right to exploit the performances. *See* Transcript of Hearing before the New Jersey District Court conducted on July 19, 1993 at 8 ("District Court Transcript"). However, it is well settled that intellectual property rights are separate and distinct from the material objects in which the work is embodied, so that an author has the power to convey ownership in the material object (e.g. a book) while reserving the common law copyright (e.g. the right to publish, reproduce or exploit the prose). *See generally* 18 Am.Jur.2d *Copyright and Literary Property* § 69 (1985). Therefore, even though Columbia validly transferred physical possession of the tapes to Clark, without Columbia's (or now Sony's) permission to exploit the tapes, Clark could not reproduce or distribute copies of the tapes.

The distinction between possession of the res and ownership of the copyright is clearly explained by the New York case of *Chamberlain v. Feldman*, 300 N.Y. 135, 89 N.E.2d 863 (N.Y.1949). In *Chamberlain*, defendant purchased an original unpublished Mark Twain manuscript at an auction sale. *Id.* at 137, 89 N.E.2d 863. Defendant published the manuscript without the consent of the executors of Twain's estate and the executors brought suit to enjoin defendant. *Id.* at 138, 89 N.E.2d 863. Clarifying the distinction between the manuscript and the intellectual property, the court concluded:

> [t]he common law copyright, or right of first publication, is a right different from that of ownership of the physical paper; the first of those rights does not necessarily pass with the second; and 'the separate common law copyright or control of the right to reproduce belongs to the artist or author until disposed of by him and will be protected by the courts.'

*Id.* (citations omitted). As there was no evidence that Twain intended the manuscript to be published, the court concluded that defendant's purchase of the physical paper

---

**1.** Pursuant to the Copyright Act: "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is 'fixed' for purposes of this title if a fixation of the work is being made simultaneously with its transmission." 17 U.S.C. § 101.

did not include the right to publish the manuscript. *Id.*

State law protection of pre–1972 sound recordings varied from state to state. The relevant state court decisions often did not involve the label "common law copyright" but rather were based upon an asserted "property right," or upon a theory of unfair competition. 2 Nimmer § 2.10[B].[2] New Jersey has applied the unfair competition theory of protection to pre–1972 disputes. *See Columbia Broadcasting v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 341 A.2d 348 (N.J.Super.Ct.App.Div.1975).

In *Melody Recordings,* CBS, a manufacturer of sound recordings fixed prior to 1972, brought suit against defendants who had reproduced CBS tapes and records without authorization. The appellate division noted that the doctrine of unfair competition traditionally has been interpreted by courts in accordance with common law principles and that the tendency of the law has been to espouse "more scrupulous standards of business fairness and commercial morality in trade." *Id.* at 375, 341 A.2d 348 (citing *Q–Tips v. Johnson & Johnson,* 206 F.2d 144, 145 (3rd Cir.), *cert. denied* 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953)). The court articulated that what is protected under the doctrine of unfair competition is the actual performance of the artists and not the musical composition. *Id.* at 378, 341 A.2d 348. The court found that the *Melody Recordings* defendants had pirated the actual performance through copying, hence, the court concluded that defendants had misappropriated CBS's "unique product" and that CBS suffered commercial injury because defendants

sold CBS's product for a substantial profit. *Id.*

*Melody Recordings* is directly on point. This court has already determined that the debtor owns the tapes. Sony has demonstrated that, pursuant to agreements with the performers, it has exclusive ownership rights in the performances fixed on the audio tapes. Consequently, Sony would suffer commercial injury if Clark were permitted to copy and distribute copies of these sound recordings. It would, therefore, be a violation of unfair competition principles for debtor to exploit the performances embodied on the tapes.

*Permanent Injunction*

 The sole remaining issue is whether Sony is entitled to a permanent injunction, prohibiting the exploitation, reproduction or other commercial use of the material contained on the tapes in question. The bankruptcy court has the power to enter a permanent injunction pursuant to 11 U.S.C. § 105. *Celotex Corp. v. Edwards,* —— U.S. ——, —— – ——, 115 S.Ct. 1493, 1497–99, 131 L.Ed.2d 403 (1995).[3] Courts may enter a permanent injunction only "after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.,* 906 F.2d 934, 941 (3rd Cir.1990). In copyright infringement actions, when a court finds a likelihood of infringement, the court will presume that the irreparable harm requirement for issuance of a preliminary injunction has been met. *Educational Testing Services v. Katzman,* 793 F.2d 533, 543–44 (3rd Cir.

---

**2.** For decisions under a property right theory *see, e.g., Waring v. WDAS Broadcasting Station, Inc.,* 327 Pa. 433, 194 A. 631 (Pa.1937); *Capitol Records, Inc. v. Mercury Records Corp.,* 221 F.2d 657 (2d Cir.1955) (application of state law under diversity jurisdiction). For decisions under an unfair competition theory, *see, e.g., Capitol Records, Inc. v. Erickson,* 2 Cal.App.3d 526, 82 Cal. Rptr. 798 (1969) *cert. denied* 398 U.S. 960, 90 S.Ct. 2176, 26 L.Ed.2d 545 (1970); *Columbia Broadcasting System v. Spies,* 167 U.S.P.Q. 492 (Ill.Cir.Ct.1970).

**3.** The *Celotex* court held that the bankruptcy court has the power to enter injunctions in mat-

ters "related to" the main case. It follows that if the bankruptcy court has such power, it clearly has the power to enter injunctions in core proceedings. Additionally, it appears that even the dissenters would agree the bankruptcy court has the power to enter an injunction in a core proceeding. Justice Stevens, writing for the dissent argued that the distinction between core matters and "related to" proceedings "is critical, if not dispositive." *Celotex,* at ——, 115 S.Ct. at 1499. Stevens then stated that the jurisdiction to hear "related to" matters provides insufficient jurisdiction to issue an injunction. *Id.* Thus, Stevens implied that a bankruptcy court does have the power to issue an injunction in a core matter.

1986); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989). It is clear from the instant case, that if the debtor were to exploit the performances on the tapes it would be guilty of common law copyright infringement and unfair competition. Thus, it follows that pursuant to *Educational Testing Services*, the court may presume irreparable harm for *permanent* injunction purposes. As debtor offered no proof in opposition to this presumption, this court finds that the irreparable harm requirement has been met.

Even in the absence of a presumption of irreparable harm, actual irreparable harm is readily apparent. Sony would not have an adequate remedy at law for the damages which it would suffer as a result of the reproduction of the tapes. Should debtor copy and distribute the tapes, Sony would risk the loss of its reputation and a loss of the reputation of the artists who entered into the exclusive arrangements with Sony. It would also face the loss of good will and revenue. Each of these injuries is irreparable and could not be adequately compensated by money damages awarded some time in the future.

With regard to a balancing of the equities, the public interest will be best served by the issuance of the permanent injunction. As expressed by the *Columbia* court, the public has a strong interest in ensuring "scrupulous standards of business fairness and commercial morality in trade." *Columbia*, 134 N.J.Super. at 375, 341 A.2d 348. There is no public interest argument that could be made in favor of the debtor. As mentioned above, it is black letter law that one who purchases a book or a tape is not automatically authorized to copy and distribute copies of the underlying work for profit. Debtor either knew or should have known that when he purchased the tapes he was undertaking the risk that the performances embodied therein might not be exploitable. As all of the factors have been met, the court finds that a permanent injunction, restraining debtor from copying and distributing copies of the tapes, shall be issued.

Ownership of the tapes, however, shall remain with the debtor. These tapes are property of the estate, 11 U.S.C. § 541, and may be sold if such a sale is in the best interest of the estate. 11 U.S.C. § 363. Sony argues that the injunction should prohibit the sale or lease of the tapes to protect Sony from the actions of the third party purchasers or lessees. Such a provision would be in contravention of the principle relied upon by Sony, i.e. that there is a difference between ownership of the tapes and ownership of the sound recordings embodied therein.

The Copyright Act provides that infringing copies may be ordered by the court to be impounded or destroyed. 17 U.S.C. § 503. This section obviously does not apply because, as discussed above, the tapes in question are not protected by the Copyright Act. Additionally, the reasoning behind 17 U.S.C. § 503 does not apply. The ruling of this court is that the common law copyright to the performances embodied on the tapes belongs to Sony. This court has not ruled that debtor has infringed this right. Of course, if debtor were to copy and distribute these tapes, infringement would be found and perhaps a remedy similar to § 503 of the Copyright Act would be appropriate. In *In re Audiofidelity Enterprises, Inc.*, 103 B.R. 544 (Bankr.D.N.J.1989) (Tuohey, J.), the court was faced with a conflict between fostering the policies under chapter 11 of the Bankruptcy Code and preserving copyright rights. Judge Tuohey determined that the copyright rights were paramount where debtor had been found liable for infringement and therefore ordered destruction of the offending materials pursuant to 17 U.S.C. § 503. *Id.* at 547–48. He so ordered even though the materials would have yielded $300,000 for the estate if they had been sold. *Id.* In the present case, while Sony is the owner of the common law copyright, there has not yet been an infringement. Without a countervailing copyright violation, the court must enforce the policies of the Bankruptcy Code and allow the debtor-in-possession to sell the tapes if 11 U.S.C. § 363(b) or (c) is satisfied.[4]

---

4. As the issue of whether such a sale would be in the ordinary course of business is not before the

*Conclusion*

A permanent injunction shall issue, restraining debtor from copying or distributing copies of the tapes in question. As to Sony's complaint for conversion, the court finds in favor of defendant and against plaintiff. The court holds that the debtor-in-possession is the rightful owner of the original tapes. The debtor-in-possession may retain the tapes or sell them pursuant to 11 U.S.C. § 363.

Counsel for the plaintiff shall submit a proposed order embodying the terms of this opinion within ten days of the date hereof.

court, the court declines to rule on the issue of whether § 363(b) or § 363(c) would be the applicable section for a sale of the tapes in question.